1

2   Fred Diamondstone
    Attorney
3   1218 Third Ave. Suite 1000
    Seattle WA 98101
4   206-568-0082

5   Michael E. Withey
    Attorney
6   528 33rd Ave. South
    Seattle, WA 98144
7   206-999-8308

8   Leah S. Snyder
    Ember Law PLLC
9   1001 Fourth Ave., Suite 3200
    Seattle, WA 98154
10  206-899-6816

11

12          **UNITED STATES DISTRICT COURT**
     **WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

13   MICHAEL E. WITHEY and SHARON          No.
14   MAEDA,
                                           COMPLAINT FOR RELIEF
                          Plaintiffs,      UNDER THE FOIA
15
16           vs.

17   FEDERAL BUREAU OF
     INVESTIGATION (FBI),
18
                          Defendant.
19

20          "Oh, what a tangled web we weave when first we practice to deceive."

21                                  *Marmion*, by Sir Walter Scott

22                              **INTRODUCTION**

23          1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C.

24   Section 552, for injunctive, declaratory and other relief, seeking the release of Federal

25   Bureau of Investigation (FBI) records related to one of its informants from the 1980s,

26   requested by Plaintiffs Michael Withey and Sharon Maeda.

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 1

    #

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

2.      In a precedent-setting lawsuit, a Seattle jury found in 1989 and U.S. District Judge Barbara Rothstein found in 1990 former Philippine dictator Ferdinand Marcos, Imelda Marcos and others liable for the 1981 political assassinations of Silme Domingo and Gene Viernes.  Domingo and Viernes were U.S. labor union leaders and anti-Marcos dictatorship activists who sought to bring democracy to their union and to their ancestral homeland. What remains unknown is the full extent of the Marcos-funded conspiracy to assassinate them and how it came to pass that these murders were witnessed by Levane Forsythe, a Seattle Office FBI informant, who also went on to perjure himself in an unsuccessful effort to exonerate the hit-men.

3.      Plaintiffs sought documents from the FBI related to its informant, his long history with the FBI, his ties to the Howard Hughes Empire, how he got to the scene of the murders, who was involved in concocting his false testimony and other questions in order to complete their goal to determine facts behind the murders and the cover-up, including all of those involved.

4.      The FBI has failed in its legal obligations under the FOIA to provide those documents to Plaintiffs and, instead, has asserted frivolous exemptions for personal privacy and law enforcement privilege, despite the passage of 37 years and the existence of an overriding public interest in uncovering the actions of the FBI and its informant. Accordingly, Plaintiffs file this lawsuit.

**JURISDICTION and VENUE**

5.      This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. Sections 552(a)(4)(B) and 5 U.S.C. Section 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. Section 1331. Venue is proper in this judicial district under 5 U.S.C. Section 552(a)(4)(B) as Plaintiffs reside in this district.

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 2

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

**PARTIES**

6.      Michael Withey is a human rights attorney and author of *Summary Execution;*
*The Seattle Assassinations of Silme Domingo and Gene Viernes* (WildBlue Press 2018), a
book about the Domingo and Viernes murders and the efforts to uncover those parties
responsible for those murders. Withey was also lead counsel for the *Estates of Domingo and*
*Viernes vs. Republic of the Philippines et al,* U.S. District Court (W.D. WA) C82-1055VR as
more fully described herein.

7.      Sharon Maeda is a documentary filmmaker who is working on a movie about
the lives and murders of Domingo and Viernes.

8.      Defendant Federal Bureau of Investigation is an agency established in the
executive branch of the United States Government. The FBI is an agency within the meaning
of 5 U.S.C. Section 552(f)(1).

**FACTS**

**A.      Historical Facts and Background**

9.      On June 1, 1981 Silme Domingo and Gene Viernes, two anti-Marcos union
activists, were assassinated in the Local 37 ILWU union hall in Seattle by a gang of hit men
who were paid to kill them by the dictatorial regime of former Philippine President Ferdinand
Marcos.

10.      9 and ½ years later the Marcoses were found liable for the murders by a
federal court jury, the first and only time a foreign head of state has been held liable for the
murders of U.S. citizens on U.S. soil.  *Estates of Domingo and Viernes vs. Republic of the*
*Philippines,* # C82-1055VR.

11.      In January of 1990, U.S. District Judge Barbara Rothstein entered a
Memorandum Decision against Marcos' allies who provided funds for the payment to the
gang for the murders and provided the murder weapon to the hit men. She specifically found
that the murders were overt acts of a civil conspiracy initiated and operated by the Marcoses

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 3

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

to harass, intimidate and operate against anti-Marcos persons and groups in the United States. The total damages awarded to the Estates amounted to $23.1 million.

12.     On or about June 3, 1981 the FBI Seattle Office entered the investigation of the murders as a potential violation of the Hobbs Act and over 42 FBI agents worked on the investigation, but no charges were ever brought.

13.     At the King County Superior Court trial of the hit men, Jimmy Ramil and Ben Guloy (King County Superior Court # 81-1-01924-9), testimony by first responders proved that Silme Domingo, with four bullet holes in his stomach, had named Ramil and Guloy as having shot him.

14.     At the very end of that trial, a mystery witness, Levane Forsythe, appeared for the defense and testified that he was present at the murders and rushed over to the slain man (Silme Domingo) outside the union hall. He claimed falsely Silme Domingo said he did not know who shot him and committed perjury in this and other testimony in that trial.

15.     This witness, Forsythe, was, at the very time of the shooting, an active and paid informant for the FBI with a "C" number ( FBI #:C-124363J1).  Forsythe had for years been well known to the Seattle Office of the FBI as a former "bag-man" for the reclusive billionaire Howard Hughes and as involved in the infamous "Morman Will" hoax. Despite this background the FBI continued to use Forsythe as a paid FBI informant both in Seattle and elsewhere.

16.     Forsythe was originally a suspect but was also used as an informant in a "loan shark" investigation which was one of the subject matters of the Freedom of Information Act requests made by Plaintiffs.

17.     The "loan shark" investigation has not been specifically identified with respect to participants, accused persons, convicted persons, and others, but redacted documents disclosed by the FBI in response to Plaintiffs' FOIA requests revealed that the investigation involved a satisfaction of lien document filed under Pierce County Auditor's

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 4

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

File # 2966535.  Based on the disclosure of that redacted document, Plaintiffs determined that Forsythe was used as an informant in *United States v. Williams*, 668 F.2d 1064 (9th Cir. 1982), and that this case identified the criminal defendants whose names were redacted by the FBI in its response to Plaintiffs FOIA requests.

18.     The FBI officially closed its case against Forsythe in the "loan shark" investigation two days after he was dispatched to the scene of the Domingo and Viernes murders to report on what had occurred to his superiors.

19.     The FBI Office in Seattle had at least three ongoing investigations in June of 1981 which intersected:

a.     a longstanding foreign counter-intelligence operation against the Union of Democratic Filipinos (KDP) of which Gene Viernes and Silme Domingo were leaders (Seattle FBI Files ## 105-9034 and 105-10262);

b.     the Hobbs Act investigation into the Domingo and Viernes murders in which Forsythe was an eyewitness (identified in some documents as File #195B-11 and as #195B-23) and other potentially illegal activities by persons associated with the union, Local 37 ILWU, including Fortunato "Tony" Dictado and Constantine "Tony" Baruso.

c.     the "loan shark" investigation (identified in some documents as file #SE179-58 and as #SE179B-58) which resulted in the convictions of three individuals for federal law violation and in which Forsythe was both a suspect and then an informant. This investigation had resulted in an extensive examination of Forsythe's background and history as an FBI informant.

20.     Plaintiff Withey received, by way of a prior FOIA request to the FBI in 1982, over 20 volumes of records related to the foreign counter-intelligence operation against the KDP purportedly related to an investigations of a potential Foreign Agents Registration Act (FARA) violation, which records included the investigation of the KDP in Seattle by the

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 5

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

Seattle Office of the FBI and the names, activities, beliefs, documents and actions of the leadership of the KDP in Seattle, including Silme Domingo.

21.     This investigation included FBI actions which, amongst other things:

a.     identified KDP chapter and national leaders and members;

b.     reported on its activities including peaceful and non-violent demonstrations by anti-Marcos organizations, at local Philippine Consulates, including Seattle's;

c.     took photographs of KDP members attending public conferences;

d.     infiltrated the KDP leadership through agents or informants becoming high ranked members of the organization and gaining access to leadership meetings;

e.     used numerous unnamed "sources" (e.g. T-1, T-2, T-3 and T-4) as well as "informants" in its investigation, including informants who were present inside secret meetings of the KDP leadership in Seattle which included Silme Domingo in the mid-1970s and later;

f.     obtained internal documents describing the KDP's policy, program and strategies;

g.     collected publicly available newspapers, documents, campaigns etc. of the KDP;

h.     interviewed local community leaders and dignitaries (Fred Cordova) and newspaper employees regarding the activities of the KDP;

i.     included reports containing detailed descriptions of the role of the KDP in promoting other causes, such as ending discrimination in the construction trades with the United Construction Workers Association (UCWA), and the Seafood industry with the Alaska Cannery Workers Association (ACWA), which Silme Domingo helped found and Gene Viernes worked with.

j.     The FBI file on the Seattle KDP (#105-9034) identifies Silme Domingo on at

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 6

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

least 8 known occasions, along with other key KDP members in Seattle such as Cindy Domingo, Nemesio Domingo, Jr (sister and brother of Silme Domingo, respectively), Dale Borgeson and David Della.

22. These FBI files also include at least one document generated and provided to the FBI by the Naval Investigative Service (NIS), at its office at Alameda Naval Air Station in Alameda California, referencing "continuing coordination maintained with the FBI San Francisco during the course of this investigation." The known FBI files numbers included in the San Francisco office investigations are ##97-416, 97-431, 97-432, 105-27565 and 105-32707.

23. Pursuant to an Executive Order issued in 1976, the NIS had infiltrated the KDP with at least two informants who provided detailed information about the KDP nationally, including its unproven suspicion that KDP members were providing material and financial support to the opponents of Philippine dictator Ferdinand Marcos in the Philippines.

24. Other NIS documents describe the fact that the NIS routinely provided the results of this intelligence operation to the FBI office in San Francisco, the Legat (Legal Attaché) of the U.S. State Department in Manila and to intelligence agencies of the Marcos regime.

25. Plaintiff Withey received, by way of subpoena issued in *Estates of Domingo and Viernes v. Republic of the Philippines*, over 14 volumes of documents related to the Hobbs Act investigation of the FBI in which 42 FBI agents in the Seattle office and FBI HQ were identified by name. These agents included Special Agent Lee Zavala, Head of Station Paul J. Mack and his deputy George Fisher.

26. The Seattle office of the FBI entered the investigation of the Domingo and Viernes murders in early June 1981 after receiving information that the murders may have been related to the two reformers activities within Local 37 of the ILWU (Alaska Cannery Workers) and therefore constituted a violation of the Hobbs Act, which prohibits the use of

COMPLAINT FOR RELIEF UNDER THE FOIA – PAGE 7

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

1  violence in labor disputes.

2        27.    Special Agent Hector Lee Zavala was assigned to head the Hobbs Act

3  investigation and it eventually employed over 42 FBI agents. Thousands of hours were

4  devoted to this investigation.  The FBI interviewed and wrote 302 reports on scores of

5  members of Local 37, ILWU, employees of the Seafood Industry, forensic experts involved

6  in the murder investigation and the identification of the murder weapon owned by

7  Constantine "Tony" Baruso, eyewitnesses and the witnesses interviewed by the Seattle Police

8  Department, including the same key KDP members in Seattle such as Cindy Domingo,

9  Nemesio Domingo, Jr (sister and brother of Silme Domingo, respectively), Dale Borgeson

10  and David Della who had been targeted in the then-existing FBI investigation of the KDP.

11        28.    The files produced included both the handwritten notes of the FBI agents

12  conducting such interviews, along with the formal typed 302 forms.  Special Agent Gerard

13  Murphy, who had been part of the Seattle FBI Office's Foreign Counter-Intelligence (FCI)

14  unit was also active and took over leading the investigation when Zavala left the FBI in 1982.

15        29.    During the investigation, Lee Zavala grew suspicious that his superiors in the

16  Seattle office were not going to indict Baruso, despite the strong evidence of his guilt.

17        30.    Zavala relayed to Plaintiff Withey that the federal authorities were

18  considering granting immunity to Baruso in exchange for his testimony implicated the gang

19  leader Fortunato "Tony" Dictado.  At that time Dictado had already been charged by King

20  County prosecutors with First Degree Aggravated Murder of Silme Domingo and Gene

21  Viernes in September 1981 and his case was set for trial in April of 1982.

22        31.    This plan was alarming to Withey who believed that the FBI and U.S.

23  Attorney's office should have followed normal procedures by offering immunity to Dictado

24  to implicate the higher-up, Baruso, who had provided the funds from the Marcos intelligence

25  slush fund and the murder weapon to the hit men.

26        32.    Eventually Zavala thought his superiors were trying to falsely blame him for

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 8

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

not conducting a thorough investigation and took steps to forestall this. After doing so, he received and accepted an unsolicited job offer from Sealand Corporation and left the FBI in early 1982. He was succeeded by Special Agent Murphy.  Zavala's – and then Murphy's – supervisors included Paul J. Mack and George Fisher.

33.     There is no record produced that anyone from the FBI questioned Forsythe about his role in the murders. If this happened, the FBI has failed to produce any documents referring to such interview in response to Plaintiffs' FOIA request.  Lee Zavala was subpoenaed and testified about an unrelated matter in the Ramil and Guloy trial the day after Forsythe testified. There were at least two lengthy articles in the local newspapers describing Forsythe's testimony at trial and his history. One included his photograph.  On information and belief, Plaintiffs allege that FBI agents were aware that Forsythe had testified in that trial.

34.     On June 16, 2015 Plaintiffs made a FOIA request for institutional records of the FBI concerning Levane Malvison Forsythe and his associates, employers and other persons.  (A copy of the request is attached as Exhibit 1.)  As more fully described below, this request resulted the long-delayed April 2018 disclosure of a small and heavily redacted portion of the FBI files on the "loan shark" investigation.  No other documents on Forsythe were provided. This lawsuit involves these related investigations and the failure of the FBI to produce documents related to Forsythe's extensive and paid work as an FBI informant, including but not limited to the "loan shark" investigation.

35.     In response to Plaintiffs' FOIA request, over time, the FBI has identified varying numbers of response pages, from approximately 1,100, to over 1,500, to 1276, to 658, as more specifically alleged below.

36.     This lawsuit and the underlying request involve significant public interest. The political assassinations of Domingo and Viernes have been the subject of extensive and ongoing press coverage, three books about the murders (Summary Execution: The Seattle

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 9

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

Assassinations of Silme Domingo and Gene Viernes (WildBlue Press 2018), A Time to Rise (UW Press, 2017), and Victory over Marcos, (by Tom Churchill 1991) and a One Generation's Time: The legacy of Silme Domingo and Gene Viernes, a 2013 documentary movie by Seattle Channel, the City of Seattle's municipal television station.

37.     The trial of Ferdinand Marcos marks the first and only time in U.S. judicial history where a foreign head of state has been held liable for the murders of U.S. citizens on U.S. soil. The circumstances surrounding the FBI's handling of Plaintiffs' FOIA request raise important questions as to whether the FBI is engaged in an ongoing cover-up and potential obstruction of justice in its handling of its informant, Levane Forsythe. It raises serious questions as to the FBI's role in itself conducting a national investigation of the Union of Democratic Filipinos (KDP), as well as other sectors of the anti-Marcos movement, and the FBI's assistance to the Marcos dictatorship's intelligence operation against that movement in the United States during the 1970s and 1980s (an operation that the Defense Intelligence Agency described as designed to "report on and possibly and operate against the anti-Marcos Philippine activists in the US.", according to a declassified DIA document that was used in discovery in the *Estates of Domingo and Viernes v. Republic of the Philippines* case.).

38.     Serious public interest concerns exist as to the FBI's role in failing to investigate its own informant's implausible and perjurious testimony that was contrived to assist the hit men's defense and cover up the Marcos funded conspiracy to murder Domingo and Viernes. It further raises the reasonable inference that Forsythe, as was his *modus operandi,* was sent to the scene of the murders by someone, possibly his FBI control agent, who had advanced knowledge that these political assassinations were going to happen on that day, at that location.

39.     This inference also derives from the proof presented in the trial of the *Estates of Domingo and Viernes v. Republic of the Philippines* which was characterized by Judge Barbara Rothstein as follows: "[T]he court concludes that plaintiffs provided by clear, cogent

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 10

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

and convincing evidence that the Marcoses created and operated an intelligence operation which plotted the murders of Domingo and Viernes and that Mabuhay [the intelligence slush fund] funds were paid to Baruso and used to perpetrate the murders." (Memorandum Opinion of January 12, 1990 at pp 13-14, attached to this Complaint as Exhibit 2.)

40.     Plaintiff Withey had been provided information from sources with knowledge of U.S. intelligence files that a Lt. Colonel in the Philippine Army had traveled to the U.S. in mid-May 1981 to meet with Baruso and a local consular official to arrange for the murders. That military man has yet to be identified or brought to justice.  This visit and meeting coincided with Baruso's trip to the Bay Area on May 17, 1981 where he received $15,000 out of the Mabuhay intelligence slush fund which he used to pay $5000 to the hit men, Ramil and Guloy, and deposited close to $10,000 in cash into his bank account when he returned.

41.     The same sources provided information that the Naval Investigation Service in Alameda Naval Air Station had on ongoing intelligence operation, approved by Executive Order (because it involved a military operation against a domestic organization) against the Union of Democratic Filipinos (KDP). This operation included infiltrating that group with its informants. According to such sources, the NIS had provided information to Marcos intelligence and, presumably, the FBI Office in San Francisco, that Gene Viernes had carried $290,000.00 with him on his trip to the Philippines in March and April 1981 to provide to the anti-Marcos opposition in the Philippines.  This claim was false.  Viernes carried only $2,900 with him to the Philippines. The source said the files describing such intelligence activities were starting to go missing.  Plaintiff Withey believes that this false information created an additional motive for Marcos to order the murders. It also put the FBI on notice that harm might come to Viernes and his fellow KDP activist Silme Domingo from the Marcos intelligence operation in the U.S. and/or would justify increasing its already close attention to the KDP for potential violations of the Foreign Agent Registration Act (FARA).

42.     Such knowledge could reasonably have led the FBI to place its informant

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 11

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

Forsythe at the Local 37 Union Hall where it was well known that Viernes and Domingo worked to observe whatever was going to happen. Forsythe's own description of his *modus operandi* (that he would be called to go to a particular location, observe what happened, and write a report and send it to his superiors) matches what was asked of him to do on June 1, 1981.  Forsythe wrote a report of what he witnessed that day but denied remembering to whom he sent it. He produced that report to defense counsel for Ramil and Guloy at the King County criminal trial, Cause # 81-1-01924-9.

43.     It is also in the public interest to find out who sent Forsythe to witness the Domingo and Viernes murders and who directed and/or authorized him to perjure himself at the criminal trial of Ramil and Guloy in King County Cause # 81-1-01924-9. Over 200 community leaders, elected officials, union leaders, and the Presidents/Executive Directors of major civil rights, civil liberties, constitutional rights and human rights organizations have signed a Petition to the FBI requesting that the FBI cooperate with Plaintiffs in obtaining documents about Forsythe.

44.     Ramil and Guloy were convicted of First-Degree Aggravated Murder, based in part on the testimony of two Seattle Fire Department personnel that after the murders, an injured man, Silme Domingo, had named the two men who had assailed him, names the firemen wrote down, despite Forsythe's perjured testimony.

45.     In a later trial, *State v. Fortunato Dictado*, King County Superior Court Cause No. 81-1-02795-1, gang leader "Tony" Dictado, who drove the getaway car, was also convicted.

46.     Another gang member involved in the murders, Teodorico Dominguez (nicknamed "Boy Pilay"), was murdered 18 months later after he returned to Seattle.  Pilay had told a friend that he feared returning to Seattle because he "knew too much" about the Domingo and Viernes murders.

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 12

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

**B.**     **Factual Background on FBI Informant Levane Forsythe**

47.     At that trial of Ramil and Guloy, on September 15, 1981, Forsythe testified that he was in a phone booth across the street from the Local 37 Union Hall trying to call his architect, Alex Bertulius, on a construction project he was supposedly involved with in Alaska.  By that very time, the FBI Office in Seattle, in its "loan shark" investigation, had been told by Forsythe that he was involved in a construction project in Alaska.

48.     Forsythe testified he observed two men going into the Local 37 ILWU Union Hall and then come out, get into a green car and leave. He stated that the two men on trial did not resemble the men he saw going in and out of the union hall. He testified that he saw a man come out of the union hall, holding his stomach. He claimed he went over to the man and asked if he knew who shot him and the man said he did not.  He claimed the man spoke with a Filipino accent.

49.     Forsythe claimed he tried to use the phone booth to call for help but the man in the booth refused to let him use it. He stated he got into his car, which had a CB radio, but couldn't get reception. He testified that he drove around the block and didn't see anyone coming down the alley but did see a fireman assisting the slain man and since he "didn't want to get involved" so left the scene without stopping or assisting.  He claimed he wrote a report of what he had observed on June 1st and later produced it for the Prosecuting Attorney.

50.     Forsythe's testimony demonstrated a considerable knowledge of the area around the Local 37 Union Hall.  His false testimony addressed and contradicted every major piece of testimony and evidence that the Prosecuting Attorney, Joanne Maida, had presented in her case in chief, including

a.     The identity of the hit men, who Silme Domingo knew and identified to the two fireman who responded to the scene as Ramil and Guloy. Forsythe's testimony that those two men on trial did not look like the men he saw was perjured.

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 13

\#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

b.      The color of the get-away car. Prosecution witnesses had testified that the car that was seen driving away from the scene of the murders was a black Trans-Am.  A car matching this description was registered to Tulisan gang leader Tony Dictado, who was later convicted of these murders as well.  Forsythe attempted to sow reasonable doubt by claiming the car driving away was green not black.

c.      The alley way next to the Union Hall had no one in it when he drove down it. The prosecutor called Jaime Malabo who testified that he was coming up the alley next to the union hall and saw Ramil and Guloy walking quickly down the alley with a brown paper bag and getting into a car.  Forsythe's testimony contradicted this account by claiming he saw no one in the alley when he drove down it and observed the firemen assisting Domingo.

51.     On cross examination, Maida brought out that Forsythe had claimed he had delivered the famed "Morman Will" of Howard Hughes to Melvin Dumar in the desert in Utah and claimed he was a "publicity seeker."  Forsythe denied he was seeking publicity. He admitted he had worked for Howard Hughes and named Hughes employees Robert Maheu and Nadine Hensley as persons who could vouch for him.

52.     It is not known how Maida discovered Forsythe's involvement in the Hughes empire and whether she obtained this information from the local office of the FBI or other sources. Contact between Maida and the Seattle Office of the FBI regarding Forsythe would have been documented.

53.     Robert Maheu's background and history as the ex-CIA agent who ran the Hughes empire and was involved with the Mafia to create plans to assassinate Fidel Castro was well known to the FBI.

54.     The Plaintiffs in the *Estates of Domingo and Viernes v. Republic of the Philippines* took a sworn deposition of Levane Forsythe in 1985.  Michael Withey, Plaintiff

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

is this lawsuit, conducted that deposition for the Plaintiff Estates.

55.     Forsythe admitted he was a paid FBI informant who had been used in this capacity for decades.  He stated: "I had to be told what to do...what to say and what not to say," including "where to go, what to look for, how to report back."  His reports were mostly oral but included written reports.

56.      Forsythe stated he conducted electronic surveillance on behalf of the FBI "on numerous occasions" and they were court-approved ("all had a C-number"). Forsythe testified at deposition that he tapped phones "numerous times," maybe "more than 50 times." He has an FBI "C-number" which identifies "your activities and so forth. I guess they keep a record of it." He testified that he signed a secrecy agreement with the FBI in the 1940s and perhaps also in the early 50s.

57.     Forsythe testified in his 1985 deposition that he was still being used as an informant as part of a "joint Presidential task force" of the FBI, DEA and IRS. He stated that his control agent of this work was Agent Ralph Hernandez who was "the person [he] talked to regarding any activities with the task force".  He talked to Hernandez in a break in that deposition to get his permission to provide his name and contact information.

58.     Agent Ralph Hernandez was with the Department of Treasury, IRS criminal investigation division as a special agent.  Forsythe's work for the task force involved travel and use of electronic surveillance equipment.  It was an extensive operation that involved years of work.

59.     Forsythe confirmed in his deposition that someone involved in the task force had asked him about his testimony at the Ramil and Guloy trial and he had answered those questions. It "was in a room in San Francisco…and there were quite a few [task force] guys there."  Forsythe refused to answer whether he was paid for his work as an informant, an answer which creates the reasonable inference that he was.

60.     Ralph Hernandez also was deposed in the case and he testified that Forsythe

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 15

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

was considered a "reliable" FBI informant, before and after his testimony in the Domingo and Viernes murder case.

61.     Forsythe claimed to have communicated with Robert Maheu through FBI Las Vegas director Dean Elston and had met Hughes approximately 20 times. He testified that he knew a Torrance, California police captain named Don Henry, who was involved in providing electronic surveillance equipment and advice to Washington State. Forsythe said he made financial deliveries to politicians for Howard Hughes.  He used numerous aliases, including: Jack Swartz, Finn Trudell, Al Cromer, and Carl Anderson when making deliveries.

62.     In his deposition Forsythe also testified that he had taped the telephone conversation he had with King County Deputy Prosecuting Attorney Maida between the time when he came forward to state he had witnessed the murders to when he testified in open court. He played that tape at his deposition. The tape reveals that Forsythe tried to draw Maida into prosecutorial misconduct by telling her: "You just tell me what to say." Maida didn't fall for his ploy.

63.     Under Washington law, such a taping was illegal unless consented to by both parties.  At no time did Maida know about or consent to the taping of that conversation.

64.     Forsythe testified he had written a report of what he had seen on June 1, 1981 and described it to his wife, Rebecca Forsythe, and a neighbor, U.S. Navy Captain, Mark Williamson on the afternoon of the shooting when he arrived back home in Port Orchard Washington.

65.     Rebecca Forsythe was deposed and testified under oath that her husband told her about the murders when he returned to Port Orchard that evening.

66.     Additional detailed information about Forsythe was set forth in Plaintiffs June 2015 request for documents from the FBI and incorporated herein. (Exhibit 1, attached to this Complaint.)

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 16

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

**C.      The June 16, 2015 FOIA Request at Issue in This Case**

67.      The FOIA request brought by Michael Withey and Sharon Maeda in June 2015 seeks disclosure of documents generated or collected by the FBI for the years when Forsythe was used as an informant for the FBI. (See Exhibit 1, attached to this Complaint.) Although broad in its scope, the request relied upon substantial, existing documentation for the request and identified likely sources and locations of the documents sought. The broad categories of the request were for:

a.      Documents that referred to or described the FBI's use of Forsythe as a confidential informant.

b.      Documents that referenced Forsythe's testimony in the case of *State of Washington vs. Ramil and Guloy*, King County Case # 81-1-01924-9.

c.      Documents related to the FBI's knowledge of Forsythe's sworn deposition testimony in *Estates of Domingo & Viernes v. Republic of the Philippines*, (W.D. Wash # C82-1055V.).

d.      Documents related to Forsythe's contact, relationships and communications with several specifically named individuals that included:

1.      Ralph Hernandez of the joint FBI-IRS-DEA "Presidential Task Force" who Forsythe had identified as his "control agent,"

2.      Dean Elston of the FBI Las Vegas office,

3.      Pat Slavins, a former FBI agent,

4.      Robert Maheu, the former CIA officer and top operative for billionaire recluse Howard Hughes;

5.      Don Henry, a former police officer in Torrance California who Forsythe claimed had supplied electronic surveillance equipment to the State of Washington and who taught Forsythe how to use such equipment;

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 17

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

6.  Alex Bertulius, an architect from Seattle who Forsythe testified he had been trying to call on the day he witnessed the murders of Domingo and Viernes;

7.  Mark Williamson, Ralph Springer, Nadine Hensley, Bob Golden and Johnny Meyer.

e.  Documents referencing civil or criminal lawsuits involving Forsythe as a party.

f.  Documents referring to Forsythe's political cash contributions on behalf of Howard Hughes or Hughes' companies.

g.  Documents concerning Forsythe's aliases, some of which were specified.

h.  Results of the lie detector tests administered to Forsythe.

i.  Documents pertaining to the FBI/IRS/DEA Task Force whose members asked Forsythe about his testimony in *State of Washington vs. Ramil and Guloy.*

j.  Documents about anyone who contacted Forsythe about going to the location where he observed the events of June 1, 1981 (when Ramil and Guloy murdered Domingo and Viernes).

k.  Documents referring or pertaining to the identities of persons to whom Forsythe provided any oral or written report of his observations at the scene of the June 1, 1981 murders.

(Exhibit 1 to this Complaint.)

**D.   The FBI'S Response Failed to Comply with Its Legal Obligations Under FOIA**

**(1) The Subject Matter of the Documents Provided Was Very Narrow**

68.  The heavily redacted documents produced relate to only one relatively small aspect of Forsythe's work for the FBI but reveal for the first time that Forsythe worked as an informant for the Seattle Office of the FBI.  Forsythe testified under oath that he worked as

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 18

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

an informant for the FBI for many years, as described in paragraphs 51-61 above.  These activities generated contemporaneous documents within the FBI, and no one from the FBI has asserted under oath that all those documents were routinely destroyed.

69.     In response to this FOIA request, the FBI claims, without providing any declarations of persons conducting its search, that it has no records related to the Presidential task force or Forsythe's work for it, has no records of his "C-number", no record of any of his reports, no record of the secrecy agreements he signed, no record of any use of Forsythe to secure or install electronic surveillance equipment, no record of his testimony at the Ramil and Guloy trial, and no record of any interview of Forsythe about his presence at the scene of the murders in any investigation, including the Hobbs Act investigation that involved 42 FBI agents.

70.     Briefly summarized, the heavily redacted documents produced on April 24, 2018 contain FBI files from Seattle and FBI Headquarters related to a loan shark investigation in which Forsythe was identified as a potential suspect and then as a source of information, i.e. an FBI informant.  One document that was partially disclosed with all names redacted bore Pierce County Auditor's # 2966535, satisfying a lien recorded under # 2955101.

71.     The loan shark investigation covered a period between 1979 and 1985 when it was closed.  Two individuals, whose names were all redacted by the FBI from the document filed under Auditor's # 2966535, were named in the Ninth Circuit opinion in *U.S. v. Williams*, 668 F. 2d 1064, a case that Plaintiffs have only identified because of the disclosure of the Auditor's file number:

> "In mid to late October, before the loan was due, **Farmer** began receiving threats concerning repayment from Don Henry, who was introduced to **Farmer** by Marcheselli. Finally, in late November, **Farmer** decided to go to the F.B.I.
>
> The F.B.I. agents undertook an investigation and arranged to have **Farmer** cooperate in their investigation by having him wear a body recorder to tape any subsequent conversations with the defendants. Portions of the resulting tape recordings were introduced at trial against Williams and **Jenkins.** Marcheselli

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 19

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

1    pled guilty before the trial and testified for the government."

2    *U.S. v. Williams*, 668 F. 2d 1064, 1066. (emphasis added)

3    72.    This investigation involved six FBI offices (Seattle, Tacoma, San Francisco, St.

4    Lake City, Anchorage, Indianapolis), and the U.S. Attorney's offices in Seattle and Tacoma

5    Washington. Three individuals (whose names were redacted) were criminally charged, tried

6    and convicted of Extortionate Credit Transactions and conspiracy, in violation of 18 U.S.C.

7    894 and 2.

8    73.    The disclosed files reveal that Forsythe was both an informant/source of

9    information and, at times, a potential suspect in this investigation who is referred to in many

10   documents. The files also disclose that Forsythe and the other subjects of FBI reports should

11   be considered armed and extremely dangerous.

12   74.    The disclosed files describe Forsythe's supposed employment as a

13   construction contractor in Anchorage. This was his cover story for why he was present at the

14   scene of the murders. It describes his work with Alex Bertulius (who Forsythe claimed he

15   was trying to call at the time he was present at the murder scene). The FBI concluded in

16   February of 1980 that, in fact, there was no ongoing construction activity there that would

17   have involved any substantial amount time by Forsythe.

18   75.    The documents also contain a significant background history on Forsythe,

19   including his involvement with Howard Hughes and the "Morman Will" case. Portions of the

20   book, *Empire*, by Steele and Bartlett are contained in the file and refer to Forsythe's role as a

21   key eyewitness on behalf of Robert Maheu in his lawsuit to regain control of the Hughes

22   operation, as well as his claim to have delivered the "Morman Will" to the Utah gas station

23   attendant Melvin Dumar, thus perpetuating the hoax.

24   76.    One two-page document was disclosed that demonstrates a background

25   investigation of Forsythe's public records in Kitsap County.  That document bears the initials

26   of the agent "HLZ", short for Hector Lee Zavala, the lead FBI investigator in the Domingo

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 20

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

and Viernes murders.  The document does not indicate any direct contact between Zavala and

Forsythe, however.

77.     The only FBI official named in these documents was Paul J. Mack, the Seattle

FBI Station Chief Agent in Charge.  On information and belief, Plaintiffs believe Mack was a

close associate of former FBI Director J. Edgar Hoover, who had initiated the infamous

"COINTEL" operation against numerous domestic organizations and individuals, including

the KDP, as part of their "foreign counter-intelligence operation" against the KDP described

above.

78.     Forsythe was interviewed by an unnamed FBI agent in the loan shark

investigation and there is a document which states that the FBI has determined that Forsythe

was not involved in the loan sharking and that the case was "closed." The date this occurred

was on June 3, 1981, just two days after Forsythe was present at the Domingo and Viernes

murder scene.

79.     Numerous FBI Special Agents in Seattle and elsewhere had extensive ongoing

contact with its informant Forsythe over a period of years prior to the murders and the

conclusion of the loan shark investigation.  Paul J. Mack, as the Chief of Station in Seattle,

and his deputy George Fisher, who had supervised all three of the active FBI investigations

alleged herein, also had such knowledge of Forsythe.

80.     The FBI has provided no documents related to Forsythe's presence, reports or

role in relation to the events of June 1, 1981, notwithstanding the facts that (1) the FBI office

in Seattle became actively involved in a related Hobbs Act investigation which was opened

within two to three days of the murders of Silme Domingo and Gene Viernes, and (2)

Forsythe's testimony in the Ramil and Guloy trial and his photograph were prominent news

in the Seattle daily newspapers the day after his testimony and while the "loan shark"

investigation was ongoing.

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 21

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

**(2)  The FBI Misrepresented the Nature and Extent of Responsive Records**

81.     The FBI's FOIA office has made serial misrepresentations about the number, nature and extent of the responsive documents and the time it would take for the FBI to respond to the request.

82.     The first FBI substantive response in 2015 stated that "personal privacy" would prevent the release of the documents sought, but that death of a subject or public interest would affect such privacy interests and allow for greater access. (Exhibit 3 to this Complaint)

83.     In response, Requestors supplied the death certificate for Levane Forsythe and proofs of deaths of other individuals named in the Request to defeat the assertion of personal privacy concerns.

84.     Seven months later, the FBI reduced its earlier estimate that there were 1500 pages but stated that there were 1100 pages of documents that would take approximately 22 months for the FBI to process.  (Exhibit 4 to this Complaint)

85.     On July 7, 2017, the FBI wrote that there were "approximately 1276 pages" of documents that would take an additional 281 days for the FBI to process. (Exhibit 5 to this Complaint)  The responsive documents reviewed by the FBI were stated by FOIA agents Becky Bronson and Travis Mumah to pertain to an investigation of the Seattle office of the FBI in which Forsythe was a "bit player" as an informant in a "loan shark" investigation. (*Id.*). The investigation was stated to take place between 1980 and 1986 and was dropped without charges being brought. The FBI at one point claimed that Forsythe was referred to in only 12 pages that were part of the files of the Seattle office of the FBI and FBI Headquarters; no other governmental agencies were mentioned. These misrepresentations raise serious questions whether the FBI's response was arbitrary or capricious.

86.     This was the first time Plaintiffs even knew that the *Seattle office* of the FBI was involved in using Forsythe as an informant as he had denied such involvement in his

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 22

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

#

1    deposition.

2    87.   On April 26, 2018, the FBI substantively responded to the FOIA request and

3    stated that only 658 pages of documents were reviewed and only 234 were produced, with

4    substantial redactions. (Exhibit 6 to this Complaint) No documents from "OGA"—other

5    government agencies were produced, though OGA materials were referenced.  No OGAs

6    were actually identified.

7    88.   Then on May 14, 2018 the FBI stated that it had reviewed one page of records

8    to the U.S. Department of Justice, Executive Office for United States Attorneys but had

9    determined that the referred record is not responsive to the request. (Exhibit 7)

10   **(3)  The FBI Falsely Claims that the Request Was Negotiated to a Reduced Set of Documents From 1276 Pages Identified by the FBI**

11   89.   Although the FBI tries to characterize the production of April 26, 2018 as a

12   "negotiated" production, in fact, the FBI rejected the terms of the Requestors' proposal to

13   limit the scope of the request to those pages, out of the 1276, that refer or pertain to the FBI

14   agents working in the Seattle office of the FBI, including any of the 42 FBI agents who

15   worked on the investigation of the Domingo and Viernes murders.  (Exhibits 8 – 13 to this

16   Complaint**)**.

17   90.    There was no "negotiated" reduction to the June 2015 request and the

18   assertion that it was negotiated raises serious questions as to whether the FBI  acted in an

19   arbitrary or capricious manner.

20   **(4)  The FBI Refused Production of Documents and Improperly Redacted the Names of Individuals Which Have Long Been a Matter of Public Record**

21

22   91.   Three individuals, whose names were all redacted but who are named in the

23   Ninth Circuit opinion in *U.S. v. Williams, supra* were investigated and eventually indicted.

24   All three are named in that case.

25   92.   Plaintiffs timely appealed the FBI's failure to completely review all

26   documents that it had identified and to disclose requested documents, (Exhibit 14). In its

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 23

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

supplemental response to Plaintiffs timely appeal, the FBI provides a document which, for the first time, identified and named a single defendant (Marcheselli) and provided the cause number of one of the criminal actions which it had withheld in its April 2018 production of documents.  As such, this response raises serious questions as to whether the response was arbitrary and capricious. The Williams and Jenkins names, identified in the Ninth Circuit decision in *U.S. v. Williams, supra,* continue to be redacted and non-disclosed, as are the names of nearly all FBI agents in that investigation.

**(5)  The FBI's Responses Continue to Misrepresent the Documents**

93.    When, on April 24, 2018, almost three years after the initial request was made, the FBI first produced any documents, albeit heavily redacted, it became clear that:

a.    Only portions of 234 pages, not 1276, were provided; only 658 pages were reviewed

b.    Forsythe was both an informant/source of information and, at times, a potential suspect in this investigation who is referred to in almost all the documents comprising 234 pages that were partially produced, not only 12 pages as the FBI had falsely represented in Exhibit 9 to this Complaint;

c.    There were documents not produced which originated with "other governmental agencies" or OGAs, whose identities were not provided and to whom the request for documents was supposedly forwarded to on a date not specified. (Exhibit 6 to this Complaint);

d.    Publicly available documents, such as the Satisfaction of Lien #2955101, filed under Auditor's # 2966535 were redacted to remove the names and identifying information even though the information was public;

e.    No declaration was provided showing compliance with the FBI's legal duty to search all requested files and documents and/or an explanation under oath, as to any documents which had been destroyed;

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 24

\#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

f. No *Vaughn* index was provided;

g. No explanation was given as to why only 658 pages were reviewed rather than 1276 pages, and why only 234 pages were provided. No explanation is provided as to the remaining 618 pages that were neither reviewed, nor provided.

94. The FBI has provided no documents related to Forsythe's presence, reports or role in relation to the events of June 1, 1981, notwithstanding the fact that the FBI office in Seattle became very actively involved in a related Hobbs Act investigation which was opened within three days the murders of Silme Domingo and Gene Viernes.

95. In 1982 when it produced the Hobbs Act files, the FBI did not claim any "Personal Privacy" exemption for the identity of these FBI agents investigating the murders as part of the Hobbs Act investigation, though it does claim privacy for almost every agent whose names were redacted in the "loan shark" investigation files. In fact, a list of 42 agents involved in the Hobbs Act investigation was supplied by Plaintiff Withey to FOIA's Chief David Hardy and Travis Mumah as part of the Requestors' efforts to assist the FBI in complying with its legal requirement to conduct adequate searches of its files to respond to this FOIA request. (Exhibit 13**).**

**(6) There Are No Legitimate Personal Privacy Interests**

96. The FBI's initial response to the Request blindly asserted, without any apparent attempt to investigate the known or ascertainable facts, that the "personal privacy" exemption, in 5 U.S.C. 552 (b)(6) and (b)(7)(C) prevented the disclosure of any documents. In response, Requestors provided the FBI with the death certificates or other evidence that many, if not all, of the key individuals identified in the Request, starting with Forsythe himself, had passed away and therefore had no legitimate privacy interests. Requestors further pointed out the reasons why there was a strong public interest in the disclosure of the documents, irrespective of any personal privacy concerns.

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 25

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

97.     In its production of April 26, 2018, the FBI has redacted every single name of every individual referred to in the documents save three, Forsythe, Paul J. Mack, a "Special Agent in Charge" in the FBI office in Seattle and Francis J. Mullen, Assistant Director.

98.     Such a wholesale assertion of the personal privacy exemption is arbitrary and capricious, especially since the Requestors have already been provided with the identity of the 42 FBI agents in the Seattle office who were involved in the investigation of the Domingo and Viernes murders. (Exhibit 13)

99.     In its initial response to the June 16, 2015 Request, the FBI's David Hardy recognized that Plaintiffs are entitled to "greater access to the documents" if the subjects are deceased.  (Hardy Letter dated July 6, 2015 (Exhibit 3).

100.    The FBI apparently made no attempt to determine if any of the FBI agents whose names were redacted are still alive.

101.    Here the passage of more than 35 years since the events referred to in the produced documents and the present weighs significantly in favor of disclosure. The FBI has identified no legitimate privacy concerns that outweigh the public interests in disclosure in this case.  None exist.

102.    The public interest in disclosure far outweighs the negligible personal privacy interests, if any.

103.    The significant public interest here is to hold accountable all those responsible for the murder of two U.S. citizens on U.S. soil by agents of the Marcos regime in the Philippines and its cover-up.  *See, Estate of Domingo v. Republic of Philippines,* 694 F. Supp. 782 (W.D. Wash. 1988).

104.    Digging out the evidence of those who acted in concert in the murders is in the public interest. Evidence of an attempt to cover-up the identity of all of those who paid for, arranged for, and participated in a murder conspiracy funded by a foreign government and carried out on U.S. soil is in the public interest.  Forsythe's efforts to exonerate the hit

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 26

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

men was closely connected to the goals of the murder conspiracy to avoid detection. Acquittal of Ramil and Guloy, as was Forsythe's and potentially the FBI's intent, would have led to charges being dropped against Dictado and no charges ever being brought against Baruso, Malabed, the Lt. Col. or the other higher ups in the conspiracy. There is an important public interest in finding out who, if anyone, in the FBI – or known to the FBI - sent Forsythe to the scene of the murders because it would imply foreknowledge of the murders and failure to prevent them.

105.    To the extent that those involved in the cover-up were acting in concert with a now-deposed foreign government, the public interest in that government's activities on American soil is substantial. Privacy interests of living (and certainly deceased) individuals who facilitated or investigated the cover-up are far outweighed by the public interest.

106.    Those individuals who funded and/or participated in the murder conspiracy had a substantial interest in making sure Forsythe succeeded in convincing the jury that Ramil and Guloy were not involved because their acquittal would have ended the inquiry, sparing Dictado, Baruso, Malabed and eventually Ferdinand and Imelda Marcos from additional scrutiny.

107.    The information sought is likely to advance the public interest in personal and political accountability by determining the identity of individuals and/or organizations that may have acted in concert or collaboration with Baruso, or who aided and abetted him or his co-conspirators, including Marcos and Malabed , i.e. those who sent Forsythe to the scene of the murders, received Forsythe's report about what he allegedly observed there, were involved in Forsythe's taping of his call with King County Deputy Prosecuting Attorney Joanne Maida, and/or who had knowledge of Forsythe's attempt to cover up the murders by testifying falsely at the Ramil and Guloy trial.

108.    Examination of Forsythe's close association with the Robert Maheu, whose background and criminal activities as an ex-CIA officer who the Kennedy Administration

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

used to contact the Mafia to assassinate Fidel Castro, are known to the FBI, is certainly in the public interest.  The documents produced in April of 2018 refer to those individuals and Forsythe's probable connection to them. Many of the individuals referred to in the FOIA request and the produced documents are associates of Howard Hughes and Maheu. Their relationship with Forsythe forms the subject matter of many of the requests.  The documents produced by the FBI substantiate this concern in that they contain portions of the book, *Empire,* about Howard Hughes which refers to Forsythe.  Other documents related to those relationships which exist in other FBI files were not provided.

109.     The presence of Forsythe, a long time FBI informant, at the murder scene, together with the lack of veracity of his cover story for being at that location raises an inference that he, or whoever sent him there, was aware that a murder or other criminal conduct was about to take place. Whether Seattle FBI agents had advance knowledge of the murder plot or other potential criminal activity at the ILWU Union Hall on June 1, 1981 or whether the FBI lacked such advance knowledge and merely investigated their informant's presence at the scene, after the fact – or not – are all matters of public importance and concern.  The Seattle FBI office knew that Forsythe was one of its informants and that he falsely testified as a witness to the Domingo and Viernes murders, as reported in the local press.  According to Treasury Agent Hernandez, the FBI, the Treasury Department and DEA continued to use Forsythe, thereafter, as a reliable informant.

110.     The fact that for the first and only time in U.S. judicial history a foreign head of state, Ferdinand Marcos, was held personally liable for the murders of U.S. citizens on U.S. soil magnifies the public interest in identifying how Marcos and his government were able to collude with U.S. residents to prepare, carry out and cover-up these murders.

111.     The presence of an FBI informant at the scene of political assassinations originating with a foreign government raises issues of public concern, especially when that same informant tried to derail the criminal investigation in its tracks. The FBI's and the

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 28

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

public's interest in enforcing the law and deterring and punishing criminal conduct requires nothing less than full cooperation and disclosure.

**(7)   There Is No Legitimate 'Law Enforcement' Interest Because the Prosecution of the Individuals Named in the Documents Was Terminated Over 30 Years Ago**

112.    Exemption (7)(A), asserted by the FBI here exempts: "(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings ...." To justify withholding, the DOJ must therefore demonstrate that "disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated."

113.    The criminal prosecution of the three individuals originally charged in the "loan shark" investigation was terminated in 1987. The claim that the disclosure of the names of defendants and witnesses in a long ago terminated criminal prosecution would in any way impeded law enforcement functions amounts to an "arbitrary and capricious" assertion of an exemption to the FOIA.

114.    The FOIA also exempts records or information compiled for law enforcement purposes to the extent release of such records "would disclose techniques and procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. This "7(E)" Exemption does not apply.

115.    The agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed. Here the FBI has provided no such explanation.

116.    The law enforcement exemption for investigative techniques, used back in 1981, requires the government to explain how 37-year-old techniques and procedures could reasonably be expected to risk circumvention of the law today.  No such explanation would

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 29

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

1    be plausible. The assertion of this exemption was arbitrary and capricious.

2        **(8)  There Is No Legitimate Grand Jury Secrets Exemption**

3        117.    There is no legitimate "Grand Jury Secrets" interest, as asserted by the FBI,

4    because the individuals named in the FBI documents were indicted, defended and convicted.

5    Any "secrets" submitted to the sitting Grand Jury were either irrelevant or used in the

6    ensuing prosecution and thus publicly disclosed.

7        118.    There are no pending Grand Jury, law enforcement investigations or actions to

8    jeopardize. Asserting this exemption was arbitrary and capricious.

9        **E.    Plaintiffs Filed A Timely Administrative Appeal Which the FBI Denied;
            Plaintiffs Have Exhausted Their Administrative Remedies**
10

11       119.    Following the April 2018 disclosure, on July 19, 2018 the Plaintiffs appealed

12   to Director, Office of Information Policy (OIP) United States Department of Justice. (Exhibit

13   14)  The appeal raised each of the failures of the FBI alleged in this complaint.

14       120.    On September 28, 2018, Plaintiffs received a letter from the Director of the

15   Office of Information Policy, which letter attached one additional document which had not

16   been provided in the April production and stated that, otherwise, the appeal was being

17   denied.  (Exhibits 15 and 16)

18       121.    Plaintiffs have exhausted all their administration remedies and this lawsuit is

19   timely filed and appropriate.

20       **F.    The FBI's Handling of this Matter Raises Questions as to Whether It Has
            Acted in an Arbitrary or Capricious Manner**

21       122.    As alleged herein the FBI's handling of the Plaintiffs' Request raises

22   questions, under the provisions of 5 U.S.C. 522 (a)(4)(F), whether it has acted in an arbitrary

23   or capricious manner by, inter alia:

24       a.      Misstating the number of responsive documents to Plaintiffs;

25       b.      Taking thirty-four months to provide any documents to Plaintiffs whatsoever;

26       c.      Claiming its incomplete response was a result of a negotiated agreement

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 30

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

1  where the email correspondence conclusively establishes that no such

2  negotiated resolution was agreed by the parties;

3  d.    Failing to provide any review or characterization of all 1276 responsive pages;

4  e.    Failing to provide the identity of individuals who had been publicly disclosed;

5  f.    Failing to provide a *Vaughn* Index;

6  g.    Asserting frivolous "personal privacy" exemptions for the identity of FBI

7  agents where it made no effort to determine if they were still alive and where

8  the passage of 35 plus years makes *de minimis* any privacy concerns and the

9  public interest far outweighs any existing privacy concerns;

10  h.    Asserting frivolous "law enforcement" privileges where there have been no

11  ongoing law enforcement interests in this matter for over 30 years;

12  i.    Asserting a frivolous "grand jury secrets" exemption where the Grand Jury in

13  the loan shark investigation returned an indictment of three individuals over

14  35 years ago, any such information submitted to the Grand Jury was publicly

15  disclosed at trial and there is no evidence of any ongoing Grand Jury

16  proceedings related to this matter.

17  123.    The totality of the circumstances here justifies the inference that the FBI has

18  acted in its narrow self-interest to protect itself, its informant Forsythe, its agents and its

19  reputation rather than comply with its statutory obligations under the Act.

20  124.    The FBI's non-disclosure of FOIA materials in this case raises questions of

21  whether the FBI was aware - and sought to prevent investigation or documentation - of (a)

22  the presence of its informant at the scene of a murder, (b) the circumstances that led him

23  there and (c) his false testimony, all in an effort to prevent further investigation into the

24  Marcos-Malabed-Baruso-Dictado conspiracy to murder two American leaders of the

25  movement to end the Marcos dictatorship.  These circumstances support the inference that

26  the FBI had fore-knowledge of the murders, failed to warn the targets, sought to exonerate

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 31

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

the Marcos paid hit-men, and/or covered up the broader conspiracy involving the Philippine

dictator. Any of these constitutes a cover-up on behalf of those responsible for the murders of

Silme Domingo and Gene Viernes, obstruction of justice, and/or failure in its duty to

properly direct, supervise and hold accountable the FBI's confidential informant Levane

Forsythe.

125.    The FBI's mishandling of this FOIA request was part and parcel of this

obstruction of justice and cover-up of these murders.

## RELIEF SOUGHT

Wherefore, the Plaintiffs seek the following relief:

A.    An Order that the defendant promptly produce all the responsive documents

without redactions;

B.    An Order overruling each of the statutory exemptions asserted by the FBI in

response to Plaintiffs' June 2015 Request;

C.    An Order directing the defendant to produce for deposition all persons

knowledgeable about the FBI's response to Plaintiffs Request for determining:

i.   the responsiveness of the FBI to the initial Request,

ii.  the nature and extent of the search the FBI conducted for responsive

documents,

iii. the circumstances surrounding the FBI's failure to produce any documents

related to Forsythe's presence at the murder scene, his activities as an

informant and otherwise as sought by Plaintiffs' FOIA request and as alleged

above, and the "Presidential Task Force" assignment that Forsythe described,

and

iv.  the circumstances surrounding Forsythe's presence at the scene of the

Domingo and Viernes murders and his testimony in the trial of Ramil and

Guloy;

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 32

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

D.      An Order that the FBI prepare a *Vaughn* Index of the responsive documents, including the documents of "other government agencies" (OGAs), within 45 days of service of the Summons and Complaint to the extent it continues to assert any exemptions to such production as order and to supply this Court with any such documents for *in camera* review;

E.      An Order directing the FBI to identify all "other government agencies" referenced in its denial letter of April 26, 2018 within 45 days of service of the Summons and Complaint;

F.      An Order directing the FBI produce to the United States Attorney for the Western District of Washington all documents and files specifically or implicitly identified in ¶19 of this Complaint, as well as all other documents and files related to any FBI or "Joint presidential Task Force" use of Levane M. Forsythe as an informant, in their entirety;

G.      An Order setting a hearing so that the Court may enter written findings concerning the circumstances surrounding the withholding of documents, redactions of names and content from documents, failure to produce all responsive documents, and its assertions of personal privacy, law enforcement privilege and Grand Jury secrets exemptions raises questions as to whether this actions have been arbitrary or capricious agency action (as further alleged herein) as well as enter an order referring this matter to the Department of Justice's Special Counsel for investigation, pursuant to 5 U.S.C. Section 522(a)(4)(F) of the Act;

H.      An award of costs and attorneys' fees to Plaintiffs' counsel incurred in this action pursuant to 5 U.S.C. Section 522 (a)(4)(E) of the Act;

/ / /

/ / /

/ / /

COMPLAINT FOR RELIEF UNDER THE FOIA
– PAGE 33

#

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX

I.      Such other relief as the Court may deem just and proper.

DATED THIS 9th day of November 2018.

LAW OFFICE OF MICHAEL E. WITHEY

By:    *s/Michael E. Withey*

    Michael E. Withey, WSBA 4787
    Of Attorneys for Plaintiffs
    mike@witheylaw.com

LAW OFFICE OF FRED DIAMONDSTONE

By:    *s/ Fred Diamondstone*

    Fred Diamondstone, WSBA 7138
    Of Attorneys for Plaintiffs
    fred@freddiamondstone.com

EMBER LAW

By:    *s/ Leah S. Snyder*

    Leah S. Snyder, WSBA 44384
    Of Attorneys for Plaintiffs
    leah@emberlaw.com

**Fred Diamondstone**
ATTORNEY AT LAW
1218 Third Ave, # 1000
Seattle WA 98101
(206) 568-0082
(206) 568-1683 FAX